## GUNTER, EXECUTRIX, *v.* JANES, GUARDIAN.

A was indebted upon a note and mortgage to B, in the sum of $40,000. B assigned the note and mortgage to C, and received from him his notes in lieu thereof. Afterwards A mortgaged to C, together with other property, the property previously mortgaged to B, subject to first mortgage, for which C was to advance to A, from time to time, sums of money not to exceed $12,000, to enable A to pay his debts. By this mortgage C was authorized to receive the rents of the mortgaged premises, and apply them to the payment of the $12,000 and interest, and in case the rents should not be sufficient for that purpose, and A should not pay within two months after request, then C was to sell, and, out of proceeds, pay the amount and interest so advanced. C, at various times, advanced to A nearly $12,000, and collected rents to the amount of $28,000. Subsequently C died, and then his executor collected the rents: *Held,* in an action by A against C's administrator, that C acted in the purchase of the note and mortgage of B as an agent of A, and that A was entitled to the trust fund.

If the plaintiff allege an express trust, it is incumbent upon him to prove it as alleged, but such a trust may be proved by circumstances, and to ascertain the intention of the parties, the Court will consider the *then* existing circumstances.

A mortgagee, who is also a trustee, is as strictly bound to execute his trust faithfully as he would be were he not a creditor, but acting for the benefit of another *cestui que trust.*

A party seeking to enforce a trust against the administrator of a trustee is compelled, from the complex nature of the cause, to ask relief in a Court of Equity. The claimant of specific property is not a creditor within the meaning of the Probate Law, and therefore he is not bound to present his claim to the administrator.

*Per Burnett, J., on re-hearing.*—A trustee can not, by mingling trust moneys with other funds, change his character from that of trustee to that of mere debtor.

The act of either the trustee or *cestui que trust,* without the consent of the other, should not be permitted to change the relation or capacity of the parties.

If the trustee does a wrongful act, then he by the act consents to be treated as a trespasser or debtor, at the option of the *cestui que trust.*

A trustee should never be permitted to defeat the rights of the *cestui que trust,* so long as it is in the power of a Court of Equity to enforce them.

APPEAL from the Superior Court of the City of San Francisco.

This was a bill in equity to recover trust funds in the hands of the administrator of a trustee.

The action was originally brought in the name of Henry Gunter, against William Barber, administrator, with the will annexed of J. J. Starkey, deceased. Subsequent to the rendering the interlocutory decree Gunter died, and the action was revived in the name of the above-named Elizabeth A. Gunter, his widow and executrix. Barber closed his accounts as administrator, and paid over the money in his hands to Janes, the guardian of the daughter of J. J. Starkey and legatee under the will, and Janes, by stipulation, was substituted as defendant in the place of Barber.

On the seventh of March, 1850, Henry Gunter, deceased, was indebted upon note and mortgage to Thomas G. Wells, as agent for James Collier, for money lent, to an amount of from forty to sixty thousand dollars. On that day, Wells assigned the note and mortgage to John J. Starkey, and received from him his notes in substitution. Afterwards, these notes were taken up and others executed in their place by Starkey, to A. H. Dohrman, by the consent and direction of Collier. The notes to Dohrman were four in number, and amounted in the aggregate to $41,856, all bearing date March 7, 1850, and all payable April 7, 1851, and all drawing interest from date, at the rate of eight per centum per month. On the 9th of March, 1850, a sealed instrument was executed by Gunter and Starkey, wherein it was recited that:

"Whereas, the said Henry Gunter, being indebted to divers persons in divers sums of money, and being at present unable to pay and satisfy the same, hath appealed to and requested the said J. J. Starkey to advance, and he hath agreed accordingly to advance such sum or sums for the liquidation or settlement of the said debts as may be required from time to time, not exceeding the sum of twelve thousand dollars on the security hereinafter mentioned."

By the provisions of the instrument, Gunter mortgaged to Starkey certain premises, "subject to the mortgage incumbrances then affecting the same." The property mortgaged by Gunter to Starkey included, with other property, the premises previously mortgaged by Gunter to Wells. For the purpose of securing to Starkey the repayment of such sums as he should advance, together with interest thereon at the rate of eight per cent. per month, Starkey was empowered to receive the rents and profits of the property, and apply the same to the liquidation of the advances so to be made by him; and in case these rents and profits should not be sufficient for *that* purpose, and Gunter should not pay the same within two months after request, then Starkey was empowered to sell any part of the property subject to the said incumbrances, and out of the proceeds

to reimburse himself for his advances.  Starkey, at various times after the date of the instrument, advanced for Gunter nearly $12,000, and collected rents to an amount exceeding $28,000. On the 22d day of January, 1852, Starkey departed this life, and his executor afterwards collected various sums as rents from the mortgaged property.  The Dohrman notes were destroyed by the fire of May 4, 1851, and the holder neglected to present them to the executor within the time limited by the statute, and they became barrred.  They were afterwards assigned to Gunter, upon condition that one-half the amount he might recover in this suit should go to Dohrman; and Dohrman and Collier executed to the estate of Starkey a release, which was to be filed by Gunter as a paper in this suit.  The bill in this case was filed by Gunter, alleging that Starkey, in purchasing the note and mortgage of Gunter to Wells, acted as his agent and for his benefit, and claims the trust funds in the hands of the administrator, the executor having resigned before this suit was commenced.

The plaintiff had a decree in the Court below, and the defendant appealed.

*Eugene Casserly and Delos Lake* for Appellants.

Trust alleged, an express trust :   As to its legal character in the classification of trusts, it is an express trust; and it was so admitted and claimed to be on the argument at bar by at least one of respondent's counsel.

Trusts, like other contracts, are divided into, first, express; and second, implied.

An express trust may be proved either by positive and direct testimony, such as a declaration in terms, either written or verbal, or by such facts and circumstances as raise a necessary and violent presumption of such a declaration.

The express trust alleged, is, that Starkey in buying the Gunter notes and mortgage from Wells, agreed expressly to buy and hold them for Gunter's benefit; and that he received the rents and profits of Gunter's property also under an express agreement to hold them merely as indemnity against any sums he might be compelled to pay on his notes given to Wells on buying the Gunter mortgage.

Is there any adequate proof, either direct or presumptive, of such an express trust?

That there is any direct proof is not pretended.  But it is said that the presumptive proof is sufficient.  Let us see if this be so.

In the first place it is to be remarked there is no presumption in favor of such a trust.  The *onus probandi* is strictly on him who alleges it.

The rule was laid down long ago in Cook *v.* Fountain, reported at length in 3 Swanst., 590–1.

This has been the doctrine ever since, both in England and America. Gratz *v.* Prevost, 6 Wheat., 481; Boyd *v.* McLean, 1 Johns., 590; Whelan *v.* Whelan, 3 Cow., 580.

Next—there are three requisites of a valid trust, the want of any one of which will cause it to fail:

1. The intention to impose a trust on the donee must be certain.

2. The terms of the trust must be certainly ascertained, viz.: as to the property on which the trust is to attach, the parties for whom the benefit is meant, the interests they are respectively to take, and the manner in which the trust is to be performed.

3. It must be accepted on those terms by the trustee. Adams' Equity, 27, 28–9, and note 1; Steere *v.* Steere, 5 Johns., 12.

The plaintiff having alleged in his bill an express trust, it was not competent for him to fall back on an implied trust, to make out his case. He could not set up one kind of a trust in his pleadings, and another kind in his testimony. James *v.* M'Kernon, 6 Johns., 542, per Kent, C. J., 563–4, and Spencer, 561; Forsyth *v.* Clark, 3 Wend., 653–4.

The rule is perfectly established that as between the mortgagor and the assignee, the latter has a right to receive the whole debt, no matter what he paid, and though he paid nothing. Anon., 1 Salk., 155; Phillips *v.* Vaughan, 1 Vern., 335; Morret *v.* Paske, 2 Atk., 53.

Starkey, on the ninth of March, 1850, was a mortgagee of two mortgages made by Gunter, with a certain qualified trust annexed to the latter.

Under the latter, so far as he was a mortgagee, it is quite clear that no trust relation existed between him and Gunter, in the wide sense in which it is contended for the plaintiff, and which is indispensable to sustain the bill; namely, so as to deprive him of the right to make a profit for himself out of the transaction, by enforcing the first mortgage without reference to the sum paid by him.

This vital distinction between a mortgagee and a trustee, in its special sense, has, at least for many years, been recognized in the English Courts. It must be still more marked in this State, in view of the doctrine constantly maintained in this Court, that the mortgage is merely an incident to the debt. In England, the great case in point is Cholmondeley *v.* Clinton, referred to as high authority, 10 Wheat., 174,; 2 Jac. and W., 177, 182–5, by Sir Thomas Plumer, M. R., upon a re-argument reversing Sir W. Grant's decision, and 190–1, by Lords Eldon and Redesdale, on appeal in the House of Lords, affirming Sir T. Plumer's decision. All the leaders of the chancery bar—Romilly, Sugden, Leach, Shadwell, besides Mr. Charles Butler, of the law bar—were employed. One or two points of difference between a mortgagee and a (general) trustee, are conclusive. In the first

place, the mortgagee holds the property pledged for his own security and benefit.   Then, his estate is adverse and paramount to that of the mortgagor, so that he may deprive him of the possession and of the title, and may acquire it for himself against his wishes, which a trustee never can.   A mortgagee in possession is entitled to the rents and profits until his debt is paid, in his own right and as his own property, and is liable to the mortgagor for nothing but the surplus.   2 Jac. and W., 183.   He may also set up the Statute of Limitations against the mortgagor, which a trustee never can.   2 Jac. and W., 183 ; Hughes v. Edwards, 9 Wheat., 489, 497.

It is true that under the second mortgage Starkey received the property under a trust : first, to apply moneys in payment of debts; and, second, to secure him for his advances.   The latter was no more than the law implies in every mortgage to secure money loaned, or to be loaned.

The deed of March 9, could not, in any case, convert the previous purchase of the mortgage from Wells, by Starkey, into a trust transaction.   But admitting, for the argument, that the deed of March 9, 1850, made Starkey, in the widest sense, a trustee, and throwing out of view its distinct recitals, it does not follow that it operated, by relation, so as to convert the previous purchase of the Gunter notes and mortgage into a trust transaction for the benefit of Gunter.

This must be, of course, if at all, by operation of law ; there being no proof of any agreement, written or oral, between the parties that the deed should have that effect.   But, by operation of law, it can not have taken place, for the law is all the other way.

It is abundantly settled, both in England and America, by at least two cases of the highest authority, (there being none to the contrary,) that when one, who is a creditor, afterwards becomes the trustee of his debtor, neither his debt nor his right to enforce the same, by all legal means, adversely to his debtor, is affected in the least.

Prevost v. Gratz, 6 Wheat., 481, is a case in point, not only upon this question, but in its general analogy of law and facts to the present case.

As to the account and receipts, etc., signed by Starkey as trustee, etc.   The account of September 23, 1851, rendered by Starkey, is made a part of the plaintiff's testimony.   Why, is not very clear, unless that it is made out with and signed "J. J. Starkey, trustee ;" of which *descriptio personæ* hereafter.   In all other respects it makes heavily against the plaintiff's theory. The account, it will be observed, has a debit and credit side. In the former, Starkey charges Gunter with all cash paid out by him.   On this side appears an item which, though obscurely worded, refers, it is said, to Starkey's promissory notes given to

Wells upon the purchase of the Gunter notes for $41,856. Granting this for the present, it certainly charges them as so much cash paid out by Starkey. The item is :

"April 7.   To p. n. given to T. G. Wells amt. of mortgage, $41,856."

At that date Starkey had in fact paid but $6,660 on these notes.   By the plaintiff's theory, Starkey, acting for Gunter and not for himself in the purchase of the mortgage, and holding the rents and profits as indemnity merely, should have charged him only with this last amount.

Instead of that, however, Starkey charges the whole amount of his notes as so much cash paid out, an absolute debt for so much, due him by Gunter, and he strikes a balance as then due him by Gunter, of $34,196.   This, he says, is "exclusive of interest," showing that he intended to charge interest to Gunter on the whole amount.   All this falls in with our theory of the case, that Starkey, in buying the Gunter mortgage, acted as a purchaser, not as a trustee, and that the transaction created at once a debt due from Gunter to him.

This paper also proves two other important facts, namely : that Starkey, as early as September 23, 1851, was applying the rents upon the transaction of the purchase of the mortgage, as so much money in payment of a debt due to himself, (Starkey ;) and that Gunter was fully apprised thereof by the rendering of such an account.

This account Gunter received and has kept ever since without objection, which, of course, estops him from raising any now.

As to Starkey's description of himself as "trustee," etc., very much stress has been laid upon the fact that, in the account of September 21, three or four receipts and an agreement respecting Gunter's property, Starkey should have styled himself "trustee."   Yet how much does this prove ?

That he was a trustee?   Conceding this, how far does it aid the plaintiff?   "Trustee" of what ?—of course, of a "trust."   But when the plaintiff has got thus far, and it is really as far as these signatures help him, he has advanced but a very little way towards making out his case.

There is no magic, it has been well said, in the words "trust" and "trustee," nor is the meaning of them very definite, except as they are made so by proof.

The deed of March 9 declared a trust, an incidental one it is true, but still a trust ; and it seems to have been generally known between Gunter and Starkey as the "trust deed," doubtless to distinguish it from the mortgage assigned by Wells to Starkey. It was under that deed, probably, that Starkey first went into the receipt of the rents and profits which, with the payment of

them, appears throughout to have been the main or only business of the trust.

Or, Starkey may have described himself as trustee in the same limited sense in which every mortgagee is a trustee : though this is less likely.    The probability is, rather, that he used the word in its loose colloquial sense.

Besides, the rule is established, in the construction of wills, for instance, that the words "upon trust" and "trustee" will not, of themselves, create a trust where that is at variance with the general scope and purpose of the instrument.    Lewin on Trusts, 174, (22 Law Library.)

The verbal admissions of Starkey :  For many reasons, these are not sufficient to establish the alleged trust.

In the first place, they were made by a dying man the day before his death, after he had been for a considerable time shut up in a sick room.    They were never again brought to his attention, and the next day the voice that might have corrected or explained them, was silenced for ever on earth.

In the next place, they are obviously the incoherent and rambling utterances of a breaking spirit, struggling with a great mass of matters, conceiving and expressing nothing distinctly. For instance, the statement about the "compromise bond" with Wells.    This could not have been true.    Wilson could find no such document among Starkey's papers, though he looked for it. Wells, himself, one of the plaintiff's witnesses, testifying in the full vigor of his faculties, after his attention had been particularly called to the point, says there never was any such agreement, written or verbal.

But besides the insuperable intrinsic improbabilities of this testimony, there is a sound and established rule of equity as to verbal admissions, which denies to it any serious weight as evidence.

Rule against parol testimony of admissions to make out a trust: The rule is, that parol evidence of alleged admissions of the person sought to be charged as a trustee, is always to be regarded with very great jealousy, and unless corroborated by proof in writing is rarely sufficient.

Botsford v. Burr, 2 Johns., 405, is not only a leading case to the point, but, in many respects, has a striking resemblance to the present.

Steere v. Steere, 5 Johns. Ch., 2, is also a very analogous case.

It is, perhaps, needless to advert to the other rule which regards such testimony with increased jealousy when brought forward after the death of the alleged trustee, when the protection of an answer can not be had.    Adams' Equity, 33, p. 168, in notis, and cases there cited ; Chalmers v. Bradley, 1 Jac. & W., 62–63.

In any case, the entire testimony, being in contradiction of the covenants and recitals of the deed of March 9, is inadmissible,

on the known rule that parol testimony is never admitted to contradict a deed.    Botsford v. Burr, 2 Johns. Ch., 405, 415.    Either as to its expressed or implied effect.    Willis' Trust., 51-2 ; Fordyce v. Willis, 3 Brown Ch. R., 577.

If there was a trust or agreement, such as is alleged, then, upon the plaintiff's theory, his right to the fund in the hands of Thomas (Starkey's executor,) was perfect, whenever the Dohrman notes became barred, for want of presentation under the Probate Act.    This happened March 15, 1853, and from and after that date the claim of the plaintiff became one which he should have presented to the executor of Starkey.    Not having done so within ten months afterwards, it is itself barred by the same statute.

The first publication of notice to creditors by Thomas, executor, was given May 15, 1852, and the time for presenting claims expired March 15, 1853.    Probate Act, § 130, Comp. Laws, 395. Claims not due or contingent must be presented within ten months after they become due or absolute.    Ib.

1. Is this a claim within the meaning of the Probate Act?

There seems no reason for doubting it.

The language of the act is comprehensive, beyond example, it is believed.    The notice to creditors is one "requiring all persons having claims against the deceased to exhibit them," etc. The Texas statute, from which ours is mainly copied, requires all "moneyed claims against the estate" to be presented.    The alteration seems to have been studiously made, and is significant.

For the purposes of this argument it may be admitted that a claim for a trust fund, as such, does not come within our statute, on the ground that such a fund is not assets in the hands of the executor, and that as to such he is a trustee of the cestui que trust.

Was there, then, any trust fund, properly so called, in this case ?

To escape the bar of the Probate Statute, the plaintiff must show there was.

The rule is that the proof to fix a trust character upon money or other property, so as to make it a trust fund, or trust property, and enable the cestui que trust to follow it, must be quite clear. Adams' Equity, 363-4 ; Hart v. Bulkley, 2 Edw. Ch. R., 70.

In Hourquebie v. Girard, 2 Wash. C. C., 212 ; Scott v. Sherman, Willes, 403-4 ; Whitcomb v. Jacob, 1 Salk., 161 ; Robson v. Wilson, per Kenyon, quoted 1 Marsh. Ins. 295, or Paley Agency, *90 in not.; Tooke v. Hollingsworth, 5 T. R., 226-7, per Kenyon ; Vernon v. Vawdry, 2 Atk., 119.

The two following cases may show under what circumstances money or property will be declared a trust :

In Kip v. Bank of New York, 10 Johns., 62, the trustee having deposited the trust money in the defendant's bank in his own name, but in an account by itself, it was held to be a trust fund,

and that his *cestui que trust* was entitled to it as against his creditors. The Court (Kent being C. J.) placed it distinctly on the ground that the money had been so kept that it was traceable as a separate fund.

Ex parte Chion, 3 P. Wms., 187, *in not*. A factor having bought South Sea stock for his principal abroad, took it in his own name, but entered it in his books as bought for his principal. Held, that the latter was entitled to the stock against the factor's assignee in bankruptcy.

If the alleged trust is proven, we admit that the money collected by Thomas must be regared as a trust fund; the same having been collected by him as executor of Starkey. The authorities to this effect are too strong to be combated. Burdett *v.* Willett, 2 Vern., 638; Scott *v.* Surman, Willes, 400.

We contend that there was no trust fund, no trust property, coming as such to Thomas, as executor of Starkey, upon the latter's death.

If there was not, then Gunter's demand was simply a debt due him from the estate, and therefore a claim within the Probate Act, which he should have presented in writing, duly attested, within ten months from the first publication of notice to creditors, namely, on or before March 15, 1853, or within ten months after that. He has not done so—this suit having been commenced June 20, 1854; and it is therefore barred.

The following cases are cited as only a few of those at hand: Jewett *v.* Cunard, 3 W. & M., 323, a case almost precisely analogous to this; Kane *v* Bloodgood, 7 Johns. Ch., 90, a great and leading case in this country, in which Ch. Kent corrects the doctrine laid down too broadly by him in Decouche *v.* Savetier, 3 Johns. Ch., 216; and Coster *v.* Murray, 5 ib., 522; Baker *v.* Root, 4 McLean, 572; Lyon *v.* Maclay, 1 Watts., 275; Willis, Trust., *210, and cases cited; Finney *v.* Cochran, 1 Watts and S., 112; Angell Limit., 176, 177, 178; Poe *v.* Foster, 4 Watts. & S., 351; Murray *v.* Coster, 20 Johns., 575, 584–5, a bill for an account; Young *v.* Mackall, 3 Johns. Md. Ch. R., 398, 407–8; Zacharias *v.* Zacharias, 11 Harris, Pa., 452, 455–6, a strong case.

*E. W. F. Sloan* for Respondent.

So far as the mortgagee holds the legal estate in the land pledged for the payment of the debts due to him, he is, strictly spkeaing, not a trustee. But if he goes into possession of the estate before the maturity of the debt, then so far as he is accountable to the mortgagor for the rents and profits; or for the return of the property after these shall have discharged the whole debt; or for the payment of the overplus, in case of a sale by him under a power, he is, to all intents and purposes, a trustee for the mortgagor, and is so uniformly held to be. Hence, a mortgagee in possession before a decree of foreclosure and sale, is denomi-

nated a trustee. Fenwich *v.* Macy, 1 Dana, 280; Holridge *v.* Gillespie, 2 J. Ch. R., 33; 2 Story Eq., §§ 1016, 6016, *a.*

"The mortgagee, in possession, holds the estate with duties and obligations analogous, in some respects, to those of a trustee." "He can make no gain or profit out of the estate, which he holds merely for his indemnity." 4 Kent, 167.

But, it is insisted in argument, on the part of the appellant, that the assignee of a mortgage has a right to demand and receive the whole amount from the mortgagor, no matter what he may have paid for the assignment, and though he may have paid nothing. As a general abstract proposition of law, that is not questioned. If, on the seventh of March, 1850, Starkey stood entirely free and clear of any fiduciary relation to Gunter, in the purchase of the mortgage from Wells & Co.; and if that was an independent transaction, having no connection with the conveyance in trust, on the ninth of the same month, his right to foreclose the mortgage so assigned, for the full amount of the demand, would not now be questioned.

That was the character of the case, considered by the Supreme Court of the United States under the second point, in Prevost *v.* Gratz, 6 Wheat., 487.

The rule of law here contended for by respondent, was clearly expressed by Mr. J. Washington, in the following language: "I admit the soundness of the doctrine laid down by the complainant's counsel, that if a trustee, executor, or agent, buy in debts due by his *cestui que trust,* testator, or principal, for less than their nominal amount, the benefit gained thereby belongs, not to him, but to the person for whom he acted. A Court of Equity will not permit a person acting as a trustee, to create in himself an interest opposite to that of his *cestui que trust,* or principal. But this doctrine is inapplicable to the case of a *bona fide* creditor, who became so, prior to the assumption of his fiduciary character."

It is obvious, that the substitution of the promissory notes of Starkey for the notes and mortgage held by Wells & Co. against Gunter, and the conveyance, by the latter to Starkey, of his whole estate in trust, were but parts of one entire transaction, commencing on the seventh and ending on the ninth of March, 1850; that, in purchasing, from Wells & Co. the notes and mortgage of Gunter and ostensibly becoming his creditor in their stead, Starkey acted alone as agent for Gunter, pursuant to a mutual understanding between all the parties concerned, in anticipation of and to prepare the way for the conveyance in trust.

Gunter was indebted to Wells & Co. upon notes and mortgage in the sum of $41,856, principal and interest included. He was engaged in the erection of a valuable building upon the property mortgaged, with the certain prospect of letting the same at a

high rental. He was in want of some means to enable him to complete it.

Under these circumstances the arrangement in question took place. What that arrangement really was can hardly admit of a doubt.

Lees v. Nutall, 1 Rus. & Myl., 53 ; Taylor v. Salmon, 4 Myl. & Craig, 158 ; Green v. Winter, 1 J. Ch. R., 27. Also, in Hamilton v. Wright, 9 Clark and Fin., 110, recently decided in the House of Lords ; where the rule itself and the principles upon which it is founded are presented with great clearness and force by Lord Brougham.

In a case like this no circumstance can exist to raise a presumption of the extinguishment of the trust, until there has been a sale of the trust property under the power by the trustee ; or some open denial or repudiation of the trust is brought home to the knowledge of the party in interest, which requires him to act as upon an asserted adverse title. 3 Sum., 487.

The special Probate Statute can have no application to the claim of respondent. It is not true that Barber was sued as administrator. He is described as administrator *de bonis non* of J. J. Starkey, deceased ; because his appointment as such made him the trustee by the terms of the deed. The conveyance was to Starkey, his executors, administrators, etc. By virtue, therefore, of his appointment, and by the terms of the deed, he became trustee instead of the deceased.

And it was in his character as trustee that he was sued. No presentation, therefore, of the claim to him as administrator, or to his predecessor as executor, was required by the statute. The statute was never intended to apply to any cases of trusts, or trust property in the hands of executors or administrators, but simply to property belonging to them as assets of the testator or intestate. Treothick v. Austin, 4 Mason, 29. The People v. Houghtaling, 7 Cal. R., 348.

As a legal proposition, the commencement of Starkey's fiduciary character did not necessarily depend upon the execution of the trust deed. For if, upon the mere verbal request of Gunter, he undertook to act as his agent in the purchase of the mortgage from Wells & Co., he could not claim the benefit of it.

The rule on this point is thus expressed : "If a trustee should purchase a lien or mortgage on a trust estate at a discount, he would not be allowed to avail himself of the difference ; but the purchase would be held a trust for the benefit of the *cestui que trust.*" 2 Story's Eq., § 1211.

"The same principle will apply to persons standing in other fiduciary relations to each other. Thus, for an example, if an agent who is employed to purchase for another, purchases in his own name or on his own account, he will be held to be a trustee

42

for the principal, at the option of the other." 2 Story's Equity, § 1211, a.

The funds which constituted the subject of litigation in this case, were not assets in Barber's hands, subject to the general demand of creditors or distribution. They were created for and devoted to a given purpose, either fully or imperfectly expressed. And that object having failed, a trust by operation of law necessarily resulted to the party who made the conveyance.

What is the rule as between *cestui que trust* or principal, and the trustee or agent, when the latter improperly mingles the trust funds with his own so as to render them undistinguishable?

"It is the duty of the agent to keep the property of his principal separate from his own, and not to mix it with the latter; and if he does not keep it separate from his own, in cases where it is properly his duty, and afterwards he is unable to distinguish them, the one from the other, the whole will, as a sort of penalty for his negligence, be adjudged to belong to his principal." Story on Agency, § 205; Paley on Agency, 48; Hart v. Ten Eyck, 2 John. Ch. R., 108; 1 Story's Equity, § 468.

See, also, Story on Bail., § 40; and the case of Lupton v. White, 15 Ves., pp. 432, 436, 439; Docker v. Somes, 2 Mylne & Keen, 635.

*Messrs. Casserly and Lake*, counsel for Appellant, filed an elaborate brief in reply to the argument of Mr. Sloan.

*Mr. J. A. McDougall*, for Respondent, also filed a brief in support of the ground taken by Mr. Sloan.

BURNETT, J., after stating the facts, delivered the opinion of the Court—TERRY, C. J., concurring.

The main conceded facts of this case constitute an authentic chapter in the business history of the early days of California. Nothing could more clearly show the excessive confidence and the delusive anticipations of that period.

The first and main question in the case is one of fact—of intention. Was Starkey, in the purchase of the note and mortgage of Gunter to Wells, the mere agent or trustee of Gunter? or did he act for himself and for his own interest? This is the question upon which the decision must rest.

To ascertain the intention of the parties we must consider the then existing circumstances. In other words, we must judge the past by the circumstances existing in the past.

At the time the transaction had its beginning the parties did not anticipate any of the changes in the state of business which afterwards took place. They anticipated no decline in the price of property, or in the rate of rents. The income and value of the property was not expected to become less. All the features

of the transaction show this. Starkey was then considered a wealthy man; and there is nothing in the record to show that he intended to commit any fraud, either upon Gunter or Wells. The value of the mortgaged property at that time was estimated at from one hundred to one hundred and fifty thousand dollars; and the monthly income from the mortgaged premises exceeded the interest upon both mortgages. It was not expected that the money to be advanced by Starkey would long remain unpaid. This is evident from the terms of the instrument and the admitted facts. The interest upon the mortgage to Wells was the only burthen expected to be *continuing* for any considerable time. Whether the interest upon the notes to Dohrman was to be paid monthly does not certainly appear; but that such was the fact seems plainly inferable from the testimony of Wells. The witness states that Starkey paid to him $1,660 about the first of June, 1850. This payment must have been for interest, as no part of the principal was then due. When the notes to Dohrman were executed they were no doubt ante-dated, so as to be complete substitutes for the notes of Starkey to Wells.

As the plaintiff alleged an express trust, it was incumbent upon him to prove it, *as alleged*. From the nature of the case, it could only be an express trust. But conceding this to be true, this express trust may be proved by circumstances. And the plaintiff's counsel insist that the facts proved, taken together, do establish this express trust.

There is nothing in the *language* of the instrument under date of March 9, 1850, that goes either to establish or rebut the allegation that Starkey was the trustee of Gunter, in the arrangement with Wells. The terms of the instrument are expressly confined to the advances *thereafter* to be made by Starkey. Not a word is said about any other transaction. The language of the instrument is very clear, showing that it was drawn by a competent professional man. We must, then, look to other proofs to sustain the alleged trust.

It is insisted by the learned counsel for the defendant, that the alleged trust is "so unprecedented in its character as, of itself, to excite suspicion and demand scrutiny."

Viewing the transaction by the light of subsequent experience, and it must be conceded as extraordinary, in the contemplation of either theory. That Starkey incurred a liability of some $97,000, which he bound himself to meet in thirteen months, *is certain.* Regarding the transaction of Starkey with Wells as intended for a speculation, on the part of Starkey, it is difficult to see any *adequate* motive for it.

The interest that Gunter was paying upon the purchased note and mortgage was ample; and, regarding the security as sufficient, there was still no adequate inducement for Starkey to make the arrangement for his own benefit; for the reason, that

he had no money to pay for the debt, but gave his notes upon *long* time, and drawing the *same* rate of interest. What could he expect to make by the transaction ?   The interest he received from Gunter he was bound to pay to Wells.   The very fact that Starkey paid no money for the debt, and gave his own notes for the *whole* amount, drawing the same interest, and payable thirteen months after date, is one of the strongest proofs to support the theory that he lent his friend Gunter his *credit*, for the purpose of ultimately saving a property then valuable and productive.   Had Starkey purchased the debt for his own benefit, with the intention of paying for it out of his own means, then he would never have given his notes drawing so heavy an interest, and for so long a time.   Conceding that Starkey was honest, there could be no sufficient inducement for him to make the purchase, as a business transaction.   But if we concede that he then anticipated his future failure, which occurred in January, 1852, and just before his death, and that his object was to obtain possession of the rents falling due before his own notes became payable, with the fraudulent intent never to pay the notes he gave to Wells, then we can see how he could expect to gain something by the arrangement.   His notes to Wells being due *thirteen* months *after* date, and the rents coming in *monthly*, had such fraudulent purpose been contemplated, it was in his power to have collected a large sum without paying out anything, except the advances agreed to be paid to Gunter.   This harsh theory, however, is not supported by the record, and not insisted upon by the counsel on either side.

The risk of loss was the same to Starkey, whether he acted in one character or in the other.   His liabilities were the same, and his means of indemnity the same in both.   From the nature of the arrangement, there could be little or no prospect of gain to him.   At the time the arrangement was made, Starkey must have supposed that the rents of the property and its value would not decline; that the incoming rents, though not equal to the principal and accruing interest upon his notes to Wells, would at least pay all the interest and a large portion of the principal within the thirteen months, and that the property would be amply sufficient to pay the remainder of the principal, should Wells insist upon prompt payment.   Starkey held the assigned note and mortgage, and could at any time enforce payment when compelled to pay himself.   It is most probable that he anticipated making a further loan, if required.   Upon the hypothesis that the rents would exceed the interest, and pay a part of the principal, leaving thereafter less interest to pay, while the rents remained *as before*, Gunter, no doubt, based his hopes of ultimate relief.   It was this view of the matter that led to the arrangement between Starkey and Gunter.

This view is supported by all the acts of Starkey.   From a

written account, signed "J. J. Starkey, Trustee," and rendered September 23, 1851, it appears that all the advances by Starkey to Gunter, amounting to $11,940, were made before the seventh of May, 1850, and that by the first of June, 1850, he had received the sum of $19,100. After this time, namely, the sixth day of October, 1851, he executed a written instrument of compromise with Laffan and others, which he signed "J. J. Starkey, trustee of Henry Gunter." He also receipted in the same manner for moneys paid to him by different persons on the twenty-third of October, 1851.

But there is one circumstance that seems to be inexplicable upon any other theory than the one which supposes Starkey to have acted for Gunter in making the arrangement with Wells. In the account rendered September 23, 1851, Starkey charges Gunter with this item : "1850, April 7. To p. n. given to T. J. Wells, amount of mortgage, $41,856."

It seems clear, from all the testimony, that the note and mortgage of Gunter to Wells, amounted, *including* principal and interest, at the time of the assignment to Starkey, to the sum of $41,856. For this sum Starkey gave his notes, and charges Gunter, not with the principal of Gunter's note and mortgage, but with the amount of Starkey's notes to Wells. In this account a balance is struck, "*exclusive of interest*," showing that Starkey only intended to charge Gunter with the principal, not including the interest. If, then, Starkey had purchased the note and mortgage upon his own account, he should have charged Gunter with the amount of his note to Wells, "exclusive of interest." But upon the theory that Gunter was only to pay him what he was to pay, the account, as rendered, was correct.

Besides these circumstances, it is stated by Wells, that the transfer of Gunter's note and mortgage was made at the instance and request of Gunter. In the language of the witness, "the plaintiff made the whole transaction with my assent," "the said assignments were made by direction of Mr. Gunter."

There are circumstances referred to by the learned counsel for the defendant, tending to rebut the evidence for the plaintiff. But we think they are not sufficiently strong to overcome the proofs on the part of Gunter. The fact that Starkey continued to act as trustee long after the advances made by him to Gunter had been fully paid, is certainly very difficult to account for, except upon the theory of the plaintiff.

It is true that the conditions of the trust should have been reduced to writing, and we might naturally expect to find them in the article of March 9, 1850. But this omission can be accounted for upon the ground of the great confidence Gunter reposed in Starkey. So far as Starkey was concerned, it made but little, if any, practical difference to him whether the conditions of the trust were reduced to writing, or not. He had

the assignment of the note and mortgage, and was as safe in that position as in any other.   Gunter, on his part, was not in a situation to make strict terms, and was compelled to place confidence in Starkey's good faith.   It is evident, from all the circumstances, that Gunter was not an accurate business man ; but that he was careless, rash, and confiding.   He wished to pay his debts, and at the same time save his property.   His business was complex and confused ; and he seems to have plunged into everything that offered any prospect of success, however small.

It is urged by the counsel of defendant, that there is a vital distinction between a mortgagee and a trustee.   But, conceding that there is some difference between a trustee who is no creditor, and a trustee who is, we can not perceive how it can affect the merits of this case.   An ordinary trustee is a person who sustains but *one* character, and has no lien upon the trust funds, except for his compensation ; while a mortgagee, let into the possession of the mortgaged property, is both a creditor and a trustee.   So far, however, as regards his capacity of trustee, he is just as strictly bound as an ordinary trustee.   Starkey was compelled to act with strict fidelity, and could not be allowed to manage the property exclusively for his own benefit, and to the injury of Gunter.   The mortgagee, who is also a trustee, is as strictly bound to fulfill his trust faithfully, as he would be were he not a creditor, but acting for the benefit of another *cestui que trust.*

Another point urged by the counsel of the defendant is, that Gunter did not present his account to the administrator for approval or rejection, as the Probate Act requires.   But to this, it is a sufficient answer that the scope and purpose of the bill of Gunter was not the recovery of a *debt* against the estate, but to enforce his right to trust funds that had found their way into the hands of the administrator.   He was compelled, from the complex nature of the case, and the kind of relief sought, to go into a Court of Equity.   The trust funds properly constituted no part of the assets of the estate.   Where the executor or administrator has property which belongs to another, the owner is not required to present his account, as if he were a creditor.   The claimant of specific *property*, and not of a *debt*, can not properly be called a *creditor*, within the meaning of the Probate Law.   The facts of this case are substantially the same as those of the People *v.* Houghtailing, (7 Cal. R., 348.)

There are several other points, made by the counsel for the defendant, that we do not consider of material importance. Upon the whole, we think substantial justice was done by the decision of the Chancellor.   The referee seems to have given the case a very patient investigation, and his report appears to be substantially correct.

The judgment of the Court below is affirmed.

BURNETT, J., on petition for a re-hearing:

In the former opinion delivered in this case, we passed over one point, simply deciding it without giving our reasons for the decision, except by a reference to the case of the People v. Houghtailing, (7 Cal. Rep., 348.)   The defendant, in an able and elaborate petition for a re-hearing, again insists, with renewed earnestness, upon this point as being conclusive in favor of the defendant. The importance of the principle involved, and of the case to the parties, induce us to state more at length the reasons that led us to the conclusion heretofore announced.

The proposition is substantially this: that, conceding Starkey to have been a trustee, and to have received trust funds belonging to Gunter—the trust money having been mingled by the trustee with his individual property—there was no distinct trust fund in the hands of the administrator that could be identified as such; that the consequence of this confusion of trust with private moneys was, that Starkey ceased to be a trustee, and thus became a simple debtor of Gunter; and that, as Gunter did not present his claim for this debt to the administrator, within the statutory time, the same was for ever barred.   This being purely a technical ground, and one that would work great injustice in this particular case, should be clearly sustained by both reason and authority; otherwise we must reject it.

It is difficult to perceive how, in sound logic or in simple justice, a trustee, by his own voluntary act, may change his capacity, and convert himself into a mere *debtor*.   In cases of express trust, the capacity of the trustee and that of the *cestui que trust* are created by contract; and all the legal rights and duties, belonging to the one or the other, are but the legitimate results contemplated by the contract itself, and flow from the capacity of each party thus created by the concurrence of the two wills. The same power, and only the same that creates, can destroy. As it requires two or more to make a contract, it requires the same to cancel or change it.   The contract is the joint creation of both the parties.   It being the result of their concurring wills, can not be dissolved or changed by the single act of one.

If, then, in the theory of the law of contracts, the capacity of the parties can not be changed except by the mutual consent of both, the incidents attached to that capacity must remain, and the rights and duties of each should continue the same.   The act of either, without the consent of the other, should never be allowed to change the relation or capacity of the parties.   The *cestui que trust* has no right to make a trespasser or debtor of the trustee, without his consent.   If the trustee does a wrongful act, then he, by the act, consents that he may be treated as a debtor or trespasser, at the election of the *cestui que trust*.   Either party, by consent, express or implied, may place it in the power of the other to change the relation.

From the just and legitimate application of these principles, it follows that the trustee should never be permitted to defeat the rights of *cestui que trust*, so long as it is possible for a Court of Equity to enforce them. No mere technical obstacles, not founded in a rule of general practical utility, should be permitted to defeat the ends of justice in such cases.

We can not perceive, upon considerations of principle or utility, why the mingling of trust with private moneys, by the voluntary act of the trustee, should destroy the trust fund, and change the remedy or right of the beneficiary. It is true, money has no ear-marks; and, for that very reason, the mingling of trust with private funds can injure no one. The value being the same, and it being matter of the most perfect indifference whether parties get the same or other coin, so they get the sum to which each is entitled, there can result no injury to either. Common sense will not discuss the question of identity, when nothing useful can result from its determination.

"If one man," says Lord Eldon, (15 Ves., Jr., 442,) "mixes his corn or flour with that of another, and they were of equal value, the latter must have the given quantity; but if articles of different value are mixed, producing a third value, the aggregate of both, and through the fault of the person mixing them, the other party can not tell what was the value of his property, he must have the whole." The same principle was held by Chancellor Kent, (2 John. Ch. R., 108,) and approved by Mr. Justice Story. (Story on Bail, 840.)

But it will be observed, that when articles of different values are mixed, producing a third value, the innocent party is only allowed to take the whole in case he cannot tell the original value of his property. Even in case of such a mixture, if the original value of the property mixed can be ascertained, the party can only claim that value, except the mixture be willfully made, with intent to injure, or from gross negligence.

We have been cited by defendant's counsel to several cases, as authority to sustain the position assumed. In the case of Whitcomb v. Jacob, (1 Salk., 161,) it was held, that where one employs a factor to dispose of merchandise, and the factor sells the goods and has the money, it shall be looked upon as the factor's estate, and must first answer the debts of a superior creditor. So, in the case of Scott v. Surman, (Willes, 400,) it was held, that the money received by the factor went into the hands of the commissioners in bankruptcy, and that the consignor could only come in under the commission. In the case of Hart v. Bulkley, (2 Ed. Ch. R., 70,) it was held, by Vice-Chancellor McCoun, that where a co-trustee mingles the trust funds with his individual moneys, and dies, the surviving trustee can not follow the fund into the hands of the administrator, but must come in with the creditors of the intestate.

But these cases are clearly distinguishable from the case before us. There the rights of creditors were involved, while here the contest is solely between the *cestui que trust* and the administrator of the trustee. No rights of creditors are involved, but only the interest of the heir. In the case of Hart *v.* Bulkley, the administrator expressly set up the fact that the estate was insolvent, and only able to pay a portion of the debts.

In the case of Lupton *v.* White, (15 Ves., Jr., 432,) and Hart *v.* Ten Eyck, (2 John. Ch. R., 108,) it was held that, where an agent confounds his principal's property with his own, it devolves upon the agent to distinguish his own portion, otherwise the principal may take the whole. In those cases, the rights of creditors were not concerned, and the question was between the principal and agent.

But the case of Docker *v.* Somes, (2 Mylne & Keene, 655,) is a case directly in point, and sustains the view we have taken. In that case, it was held that when a trustee mixes trust funds with his private moneys, and employs both in trade as his own, the *cestui que trust* may, if he prefers it, insist upon having a proportionate share of the profits, instead of interest on the amount of the trust funds employed. The opinion of the Lord Chancellor is distinguished for its clearness, justice, and force. The authorities are reviewed and some of them questioned.

The former rule had been, to require the trustee, who mingled the trust with his private funds, to pay only legal interest upon the amount; and this, without any regard to what he had in fact made by the speculation. If he had not mingled the trust funds, but had made a speculation, then the *cestui que trust* had the right, also, to the gains. But, under the former rule, justice and expediency had been sacrificed to convenience. And it is to be regretted that too many of the rules of law were originally adopted from motives of convenience, and are still followed from the same motives, and from the hesitation Judges feel in disturbing former decisions.

It can not be well seen why a trustee, who wrongfully mingles the trust funds with his private moneys, should be in a better condition than the one who keeps them separate. " What avails it," asks the Lord Chancellor, " towards preventing such malversations, that the contrivers of sordid injustice feel the power of the Court only where they are clumsy enough to keep the gains of their dishonesty severed from the rest of their stores?" " When did any wrong-doer ever yet possess the hardihood to plead, in aid of his escape from justice, the extreme difficulties he had continued to throw in the way of pursuit and detection, saying, ' You had better not make the attempt, for you will find I have made the search very troublesome?' The answer is, ' The Court will try.'"

If the theory of the defendant be true, neither Starkey nor his

administrator could be charged anything more than legal interest, however great the actual gains may have been. Such a rule gives the trustee, at his own election, the power to borrow at the lowest rate of interest. It rewards him for his own wrong, and holds out to him a continual temptation. The rule, instead of imposing restraints, absolutely offers a bribe to the faithless trustee. It reverses every principle of equity and justice, and bestows rewards where punishment is deserved.

And if the Court, in that case, could follow out and distinguish the proper proportion of the gains, though mixed with the mass, it would seem equally competent to follow and distinguish the proper proportion of the capital, though mixed with the mass. The mixing by the trustee will not be allowed to defeat the efforts of the Court in either case.

We must adhere to our former decision.